John W. Leardi
Nicole P. Allocca
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
609-799-5150

Leslie Howard
Michael Fried
COHEN HOWARD, LLP
766 Shrewsbury Ave., Suite 200
Tinton Falls, NJ 07724
732-747-5202

*Counsel for Plaintiffs
and the Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BETH SHAPIRO, LORI ANN LOMBARDI, and HEATHER GITLIN, on behalf of themselves and on behalf of all others similarly situated, | Case No. 22-cv-1958 |
| *Plaintiff,* | |
| - v. - | **CLASS ACTION COMPLAINT** |
| AETNA, INC. and AETNA LIFE INSURANCE COMPANY, | |
| *Defendants.* | |

Beth Shapiro ("Ms. Shapiro"), Lori Ann Lombardi ("Ms. Lombardi"), Heather Gitlin ("Ms. Gitlin") (collectively, "Plaintiffs"), on behalf of themselves and on behalf of all others similarly situated, bring the following complaint against Defendants Aetna, Inc. and Aetna Life Insurance Company ("Aetna" or "Defendant"), as follows:

### FACTUAL BACKGROUND

1.      Aetna is in the business of insuring and/or administering health plans, many of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 to 1461 (the "Aetna Plans"). In that role, Aetna receives, reviews, and/or processes benefits claims for services rendered by in-network and out-of-network medical providers to

individuals enrolled in Aetna Plans ("Aetna Members").

2.     Many Aetna Plans are "self-funded" where the plan sponsor is responsible for payment of claims from its own funds and those contributed by employees. Aetna acts as a third-party fiduciary and claims administrator for its self-funded Aetna Plans.

3.     Most Aetna Plans cover health care services received by Aetna Members from either in-network ("INET") providers (who have negotiated contracts with Aetna and agreed to accept a reduced amount from billed charges for the services rendered) or out-of-network ("ONET") providers (who are not contracted with Aetna and have not agreed to accept payments based on Aetna and its agents' reimbursement determinations).

4.     To that end, Aetna Plans generally define ONET providers to be "a provider who in not a network provider," i.e., a provider who is not "listed in the directory for your plan."

5.     Aetna Plans also typically define the amount in benefits to be paid for a particular covered service under the plan to be based on a "Negotiated Charge" for INET providers and a "Recognized Charge" for ONET providers.

6.     For INET services, the Negotiated Charge is the amount a network provider has agreed to accept as a reduced amount from that provider's standard billed charges for rendering services and patient liability is limited to in-network cost sharing obligations. Based on a negotiated and agreed amount between the INET provider and Aetna, there is no balance bill owed by the member to an INET providers. In distinguishing between INET and ONET providers on its website, Aetna states the following:

> An out-of-network doctor can bill you for anything over the amount that Aetna recognizes or allows. This is called "balance billing." A network doctor has agreed not to do that.

7.     For ONET services, Aetna Plans specify that the Recognized Charge (sometimes also referred to as the "allowed amount" or the "out-of-network plan rate") will be (i) a specified

percentage of the rates at which Medicare reimburses for the applicable services or other similar provision, (ii) the "reasonable amount rate" or a similar provision that is generally based on "usual, customary and reasonable", "prevailing charge" or "reasonable charge" ("UCR") rates, or rates that represent what most other providers in the same geographic area would charge for the same treatment or (iii) 'an amount determined by Aetna, or its third-party vendors, based on data resources selected by Aetna, reflecting typical competitive charges and/or payments for a service, adjusted for the geographic area in which the service was provided" (collectively referred to as the "ONET Rates"). Generally, ONET providers are permitted to balance bill patients for the difference between their standard charges and the ONET Rates as defined under the applicable Aetna Plan.

8.      Historically, Aetna Plans reimbursed ONET services at UCR rates for many plans. Aetna previously set ONET UCR rates based on the "Ingenix Database," which was developed and promulgated by UnitedHealthcare, a competing health insurance company and claims administrator. Several litigations were brought against UnitedHealthcare and other insurers, however, based on the allegation that the Ingenix database was improperly designed to underreport UCR charges. Ingenix was therefore later replaced by "FAIR Health."

9.      FAIR Health was established as part of the settlement of an investigation by the Office of the Attorney General of New York State into the health insurance industry's practice of determining out-of-network reimbursement based on data compiled and controlled by UnitedHealthcare, which the Attorney General determined was operating under a clear conflict of interest and was alleged to underpay out-of-network services.

10.      FAIR Health was formed "to establish and maintain a new database that could be used to help insurers determine their reimbursement rates for out-of-network charges and provide

patients with a clear, unbiased explanation of the reimbursement process.

11.     Using millions of healthcare claims submitted to it by insurers, health care plans, and providers, FAIR Health created a database that reflects the rates that most providers charge in each area based on the zip code where a health care service is being provided and the Current Procedural Terminology ("CPT") Code to be used by the provider for each specific healthcare service. CPT Codes are numbers developed and licensed by the American Medical Association to identify each individual healthcare service for billing purposes.

12.     Upon the zip code and CPT Code being input into the database, FAIR Health will provide the UCR for the pertinent procedure in the designated geographic area. As FAIR Health explains:

> The Estimated Charge is what FAIR Health, based on its database, estimates that a medical provider in your area may bill for the procedure you selected when performed out-of-network. This estimate is based on the charges billed by providers for this service in the geozip where the service was performed. (A geozip, which defines a geographic region in our database, generally corresponds to the first three digits of a zip code.)
>
> The estimate shown is based on the 80th percentile, meaning that 80% of the charges in our database for this procedure in your area were lower than or equal to our estimate and 20% were higher than or equal to our estimate. We use the 80th percentile because many insurers use the 80th percentile to determine usual, customary and reasonable (UCR) rates upon which they base out-of-network reimbursement.

13.     Since the demise of Ingenix, FAIR Health has become the gold standard in determining out-of-network pricing for services rendered to patients insured through benefit plans that contemplate UCR pricing.

14.     In or around 2011, Aetna adopted Fair Health as the basis for calculating ONET Rates in the vast majority of its self-funded benefit plans, generally using the 80th percentile of Fair Health. This is confirmed by the language of those plans themselves, as well as in letters and

other claim-related communications sent by Aetna as a fiduciary to its self-funded plan clients to Aetna Members and their providers, including Explanation of Benefit ("EOB") statements and appeal letters describing the manner Aetna calculates ONET UCR rates. This is further confirmed by Aetna's own description of these terms on its website.

15.     By reimbursing at this level, ONET providers received a fair payment for their services and "Balance Billing," i.e., the patient being billed for the difference between an ONET provider's charge, and the Fair Health amount was minimal.

16.     Aetna would also access independent third-party networks through its National Advantage Program ("NAP"), to reimburse ONET services at amounts lower than the UCR rate. Aetna highlights that a plan is part of NAP by placing the NAP identification on the member's insurance card. Originally, NAP was established in part to identify those situations where Aetna contracts with several national third-party NAP vendors to access their provider networks ("NAP Contracts") and contracted rates ("NAP Contract Rates"). NAP vendors include Multiplan and Beech Street, who administer third-party provider networks.

17.     When reimbursement is made through these NAP Contracts at the NAP Contract Rates as required under Aetna Plans and other applicable documents, the ONET provider agrees not to balance bill the member. Generally, Aetna's access to NAP Contracts on behalf of its self-funded clients was/is referred to as the "Base Program." The Base Program offers access to contracted rates for medical claims that could otherwise be paid at billed charges under indemnity plans, "the out-of-network portion of network-based plans, or for emergency/medically necessary services not provided within the network."

18.     In exchange for reducing payments made to their self-insured employer clients through NAP Contract Rates and eliminating any balance bill to the affected member, Aetna was

paid a "shared savings fee" for the difference between FAIR Health and the NAP Contract Rates. This shared savings fee is often referred to as the "NAP Access Fee" in the Administrative Services Agreements ("ASAs") Aetna enters with its self-funded clients.

19.     Sometime in or around 2016, Aetna began encouraging its self-funded clients to move away from FAIR Health and UCR based ONET rates in favor of Medicare-based rates. In doing so, Aetna exponentially reduced the amount paid for ONET services, while substantially increasing the amount of Balance Billing its members could be exposed to by ONET providers who were unwilling to accept Medicare rates, which are almost universally significantly lower than UCR rates.

20.     When Aetna began moving self-funded clients to Medicare-based ONET Rates, it expanded the NAP program that was made a part of Aetna Plans for its self-funded clients by renaming the Base Program the "Contracted Rates Component" and including within that component the negotiating of "Ad-Hoc Rates" with non-NAP Contract providers. This expansion was designed to increase the NAP Access Fees Aetna charges its self-funded clients.

21.     The NAP program also includes a Facility Charge Review ("FCR") Component and an Itemized Bill Review ("IBR") Component, neither of which is directly implicated by this lawsuit. When a self-funded Aetna client with the NAP program elects to enroll in either IBR or FCR, this automatically enrolls that self-funded plan in the Contracted Rates Component, including negotiating Ad-Hoc Rates with non-NAP Contract providers.

22.     Aetna's Contracted Rate Component expanded the Base Program to also include claims from out-of-network providers covered as in-network benefits under the Plan because the claims are for emergency services, because the services are provided by out-of-network providers at in-network facilities, or because Aetna otherwise determines that the Plan Participant received

the services out-of-network because of circumstances outside the Plan Participant's control ("Involuntary Out-of-Network Claims"). Notably, Aetna's use of NAP Contract Rates for pricing Involuntary Out-of-Network Claims eliminates Balance Billing per the NAP vendor contracts with NAP Contract providers.

23.     Aetna also expanded the Contracted Rates Component beyond NAP Contract Rates; extending NAP to apply to services provided by ONET providers without a NAP Contract agreement with a NAP vendor by contracting with its self-funded clients to "attempt" to negotiate a claim specific rate/discount ("Ad-Hoc Rate") in the absence of a NAP Contract Rate.

24.     The specific contours of the NAP program are fully-set out in the ASAs Aetna enters with its self-funded employer clients. And the language effectuating the NAP program and codifying Aetna's corresponding obligations to its members are incorporated into the plan documents governing each self-funded plan Aetna administers.

25.     Aetna's Plans go one step further than the ASAs, however. While the ASAs merely obligate Aetna to "attempt" to negotiate an Ad-Hoc Rate for Involuntary Out-of-Network Claims, its NAP plans clearly and unambiguously mandate that its members ***must*** be insulated from "Balance Billing" for "Involuntary Services," which are defined under Aetna's Plans as, *inter alia*, services "[p]erformed at a network facility by an out-of-network provider, unless that out-of-network provider is an assistant surgeon for your surgery."

26.     Indeed, "Aetna's NAP Plans,"i.e., self-funded Aetna Plans that have opted to participate in the NAP program administered by Aetna, require Aetna to calculate a member's out-of-pocket exposure for Involuntary Services in the same way it would had the services been provided by an in-network provider, with the most common language appearing in Aetna's NAP Plans stating: "[w]e will calculate your cost share for involuntary services ***in the same way as we***

***would if you received services from a network provider*** (emphasis added)."

27.     And while Aetna's NAP Plans often define the Recognized Charge, i.e., the ONET Rate, as a set percentage of the Medicare fee schedule, those same plans also clearly and unambiguously state that the "Recognized Charge does not apply to involuntary services." So, under Aetna's NAP Plans, Involuntary Services, including services are provided by out-of-network providers at in-network facilities, are ***never*** subject to the Recognized Charge.

28.     In fact, Aetna's NAP Plans contain ***no*** pricing methodology for Involuntary Services provided to a NAP plan member by an ONET provider without a NAP Contract vendor agreement other than Aetna's clear and unambiguous obligation to immunize the member from any cost-sharing liability more than what would be payable to access in-network services.

29.     To meet its fiduciary obligations to its NAP Plan members receiving Involuntary Services from an ONET provider without a NAP Contract vendor agreement, Aetna must, under the clear and unambiguous terms of its NAP plans, either: (i) pay an ONET provider's billed charges in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an Ad Hoc Rate with the ONET provider to ensure its member is not subject to Balance Billing.

30.     Unfortunately, Aetna consistently fails to process member claims for benefits for Involuntary Services provided to a NAP plan member by an ONET provider without a NAP Contract vendor agreement in this fashion. Instead, it routinely pays these claims—including claims submitted on behalf of the Plaintiffs here—using the Recognized Charge, a Medicare-based rate, or some other artificially low ONET Rate calculated by Data iSight, a service of MultiPlan, even though none of these various payment methodologies apply to Involuntary Services.

31.     Data iSight is a tool that MultiPlan uses to price claims that Aetna has indicated that it started using sometime in or around 2019 to price and negotiate Involuntary Service claims

submitted by ONET providers on behalf of Aetna Members replacing Fair Health. Aetna EOBs

when adjudicating such claims explain Data iSight's role in the process thusly:

> You are an out-of-network provider and do not have a contracted
> rate from Aetna. The member's plan provides benefits for covered
> out-of-network services at what we find to be a **recognized charge**.
> The **recognized charge** determination on the claim resulted in a
> reduction in payment and was calculated using the Data iSight
> database. **In the event you choose to balance bill the member for
> the amount reflected in the 'not payable' column** (in addition to
> the member's deductible that is reflected in the patient responsibility
> column), the member may be eligible for patient advocacy services
> through Data iSight to resolve the outstanding balance.   For
> questions regarding the **recognized charge** determination, contact
> Data iSight at 866-835-4022 or refer to www.dataisight.com"

32.     Aetna's website states that for ONET claims that are to be paid at the preferred/in-

network level under the terms of the member's plan of benefits, i.e., Involuntary Services, Data

iSight will negotiate with the provider so that the member is not responsible for charges more than

any applicable deductible and coinsurance/copayments.

33.     But, when members (or their duly-authorized provider-representatives) attempt to

appeal and/or negotiate these egregious underpayments, Aetna dismisses the appeals out-of-hand,

with conflicting and arbitrary positions, and refuses to meaningfully negotiate Ad Hoc Rates as

mandated by its NAP Plans.

34.     In fact, according to Data iSight representatives, effective January 1, 2021, Aetna

specifically instructed Data iSight to only make one offer to ONET providers and not to engage in

any further negotiations.

35.     Aetna underpays Involuntary Services claims and thereafter refuses to provide a

full and fair review and/or fails to meaningfully negotiate with affected members or their ONET

providers because it is financially incentivized to do so based on the NAP Access Fees it charges

its self-funded clients through the claim wire, which are based on a percentage of the "savings" it

derives from underpaying claims.

36.     Aetna's NAP Access Fee is a set-percentage of the "Savings," which is defined in the ASAs as the difference between (i) the Reference Price, and (ii) the amount Aetna allows the provider under NAP, for services or benefits covered under the Plan affected by NAP. The ASAs further define the "Reference Price" as: (i) for a professional service paid using an Ad Hoc Rate negotiated by Aetna for an Involuntary Out-of-Network Claim, the amount billed by the provider; and (ii) for all other professional services the lesser of the billed charge or the 80th percentile charge as reported by the applicable FAIR Health database.

37.     So, for Involuntary Services provided by ONET providers without a NAP Contract vendor contract, Aetna's NAP Access Fee is the difference between what it pays to that ONET provider and the ONET provider's billed charges. Thus, Aetna is very plainly incentivized to pay the lowest amount possible, if only to increase the NAP Access Fees it charges its clients.

38.     This action challenges benefit adjudications made by Aetna in response to requests for coverage under self-funded Aetna NAP Plans sponsored by private employers where Aetna failed to insulate its members from liability for Balance Billing from ONET providers for Involuntary Services, as that term is defined by the Aetna Plans, which mirrors the definition of Involuntary Out-of-Network Claims under the ASAs. Specifically, Aetna consistently and routinely underpaid claims for Involuntary Services at ONET Rates that were not Ad-Hoc Rates (or billed charges) as required by its plans and by its ASAs with its employer clients, therefore exposing Aetna Members, including the named Plaintiffs herein, to substantial Balance Billing liability, i.e., without limiting the financial exposure of Aetna Members to INET cost-sharing amounts, all to increase the NAP Access Fees it charged its employer clients.

39.     In doing so, Aetna violated ERISA by failing to pay claims in adherence with the

terms and conditions of its plans.

40.     Aetna also breached its fiduciary duties, including its duty of loyalty and ERISA's prohibition against self-dealing, by elevating its own financial interests, including its interest in generating additional NAP Access Fees, above those of its self-insured employer clients and their member-employees, and the duty to act in accordance with the terms of its ERISA plans.

## THE PARTIES

### A.     Ms. Shapiro and her ONET Surgeon Dr. Cooperman.

41.     Ms. Shapiro is a 66-year-old former Aetna member, with the health benefit plan through which she had health benefits during the time period in issue here sponsored and self-insured by her employer, Ventura, Miesowitz, Keough & Warner, P.C., but administered by Aetna pursuant to an ASA. She resides in Rockaway, NJ.

42.     Dr. Cooperman is double board-certified plastic surgeon with a private practice located at 200 South Orange Avenue, Suite 155, Livingston, NJ. His practices focus is on breast reconstruction, and he specializes in microsurgical applications.

### B.     Ms. Lombardi and her ONET Surgeon Dr. Small.

43.     Ms. Lombardi is a 55-year-old Aetna member, with her health benefit plan sponsored and self-insured by her employer, Bed Bath & Beyond, Inc., but administered by Aetna pursuant to an ASA. She resides in Pequannock Township, NJ.

44.     Dr. Small is a board certified, fellowship-trained, plastic surgeon with a private practice located at 275 Forest Ave, Suite 202, Paramus, NJ 07652. His practice includes an emphasis on microsurgical reconstruction of the breast.

**C.     Ms. Gitlin and her ONET Surgeon Dr. Tamburrino.**

45.     Ms. Gitlin is a 55-year-old Aetna member, with her health benefit plan sponsored and self-insured by her employer, Educational Testing Service, but administered by Aetna pursuant to an ASA. She resides in Doylestown, PA.

46.     Dr. Tamburrino is a double-board certified, fellowship trained plastic surgeon with offices located at 1765 Springdale Road, Suite 1, Cherry Hill, NJ 08003, and 800 W State Street, Suite 300, Doylestown, PA 18901. He is renowned for his innovative work with breast reconstruction for patients who have survived cancer.

**D.     Defendants Aetna, Inc. and Aetna Life Insurance Company.**

47.     Aetna, Inc. is a health insurance company incorporated under the laws of the Commonwealth of Pennsylvania with its registered office at 980 Jolly Road, Blue Bell, PA 19422, and with its corporate headquarters and principal place of business located at 151 Farmington Avenue, Hartford, CT 06156. Since November 28, 2018, the company has been a subsidiary of CVS Health. Either directly or through its wholly-owned and controlled subsidiaries, Aetna, Inc. issues and administers health insurance plans and is delegated responsibility to make benefit determinations pursuant to those plans. As such, Aetna, Inc. is a fiduciary under ERISA regarding the claims at issue in this litigation.

48.     Aetna Life Insurance Company is a wholly-owned and controlled subsidiary of Aetna, Inc. that was established to fulfill the functions and purposes of Aetna, Inc. and to operate subject to the decisions and guidelines of Aetna, Inc. For example, Ms. Gitlin's plan identifies Aetna Life Insurance Company as the third-party administrator, pursuant to which it operates as the "Claims Administrator" under the plan. In this role, Aetna handles pre-certification procedures, case management, claims processing, and review of claim adjudications that are appealed, and provides customer service for all these functions. Aetna also sets the terms and

conditions for benefit claims procedures (for example, establishing the Recognized Charge or determining whether a service is Medically Necessary) and manages provider networks, including the administration of the NAP program and its various components, and the adjudication of benefit claims for Involuntary Services as defined in Aetna's Plans. Thus, Aetna Life Insurance Company, acting directly and on behalf of and under the supervision and direction of Aetna, Inc., is also a fiduciary under ERISA regarding the claims at issue in this litigation.

## JURISDICTION AND VENUE

49.     Aetna's actions in administering employer-sponsored health care plans, including setting payment rates for ONET benefits under its Plans, are governed by ERISA. Thus, subject-matter jurisdiction is appropriate over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 1132(e) (ERISA).

50.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) based on Ms. Shapiro's and Ms. Lombardi's residence in New Jersey. Venue is also appropriate under 29 U.S.C. § 1132(e)(2) because Defendants may be found here and are authorized to do business in New Jersey, either directly or through wholly owned and controlled subsidiaries.

51.     This Court has personal jurisdiction over Aetna because Aetna has substantial contacts with, and regularly conduct business in, New Jersey.

## FACTUAL ALLEGATIONS

**A.     Ms. Shapiro's Claims and Appeals to Aetna for Services Provided by Dr. Cooperman.**

52.     In September 2019, Ms. Shapiro was diagnosed with breast cancer. She immediately thereafter began working with her doctors to determine an appropriate course of treatment. Ultimately, she and her doctors settled on a plan that includes a single procedure, with a reconstructive procedure to be performed immediately after the cancer removal.

53.     While Ms. Shapiro's treatment plan contemplated an INET facility, an INET oncologist, and an INET breast surgeon, there was no INET microsurgeon with privileges at her hospital of choice available to work with her surgical team. Thus, she was referred to Dr. Cooperman, an ONET reconstructive surgeon.

54.     By the time she was referred to Dr. Cooperman, there was no time for Ms. Shapiro, a woman suffering from the emotional impact of breast cancer with a desire to quickly remove the cancer from her body, to search for an entirely new INET team in her geographical area capable of providing the treatment plan she decided upon at a different facility.

55.     Ms. Shapiro's Plan's definition of "Involuntary Services" includes services "[p]erformed at a [INET] facility by an [ONET] provider," and further provides that Aetna "will calculate [the member's] cost share for involuntary services in the same way as [Aetna] would if [the member] received the services from an [INET] provider." Notably, the Recognized Charge under Ms. Shapiro's plan for ONET professional services, defined as 105% of the Medicare allowable rate, "does not apply to involuntary services". So, Ms. Shapiro's Plan, sponsored by her employer and administered by Aetna, did not contain any payment methodology for the calculation of benefits payable for ONET services performed in an INET facility, which is precisely what occurred when Dr. Cooperman joined Ms. Shapiro's surgical team. Aetna was therefore obligated under the plan to ensure that Ms. Shapiro's benefits were paid in such a way to limit her out-of-pocket responsibility for Involuntary Services to her INET financial obligations.

56.     While Dr. Cooperman agreed to take Ms. Shapiro on as a patient, his office made clear to her that it would not accept Medicare-based rates from Aetna as payment in full for Dr. Cooperman's services. Ms. Shapiro acknowledged this, and agreed to bear responsibility on a financial disclaimer dated September 23, 2019 "for any excess amount above the allowed amount

[Aetna] pays or reimburses [Dr. Cooperman[ for healthcare services received."

57.     Dr. Cooperman's office then set about having the services he intended to provide Ms. Shapiro authorized by Aetna. For example, on September 24, 2019, Dr. Cooperman's office spoke with Joy H. at Aetna (Ref # 4782210227), who verified Ms. Shapiro's deductible, coinsurance responsibility, and annual out-of-pocket maximum. During that same call, Joy H. also represented that Ms. Shapiro's plan reimbursed ONET services at 105% of Medicare rates. When Dr. Cooperman's office indicated this was not acceptable, Joy H. instructed Dr. Cooperman's office to send an authorization request along with the CPT codes to be billed, Dr. Cooperman's UCR charges for those codes, and to indicated that Medicare-based rates were not acceptable. Notably, Dr. Cooperman's office disclosed to Joy H. that the procedure in question was to be performed at St. Barnabas Medical Center in Livingston, NJ, an INET facility; but at no point did Joy H. reference the Involuntary Services language set forth in Ms. Shapiro's plan.

58.     Dr. Cooperman's office did precisely what Joy H. instructed. Specifically, Dr. Cooperman's office placed or received follow-up calls to Aetna on October 29, November 4, November 5, November 6, November 12, and November 19, 2019. Additionally, on October 29, 2019, Dr. Cooperman's office sent Aetna both: (i) a completed "Breast Reduction and/or Reconstructive Surgery Precertification Information Request Form; and (ii) a letter disclosing Dr. Cooperman's fees for the proposed procedure(s), along with a "REQUEST FOR NEGOTIATION TO BE PAID AT HIGHEST [INET] BENEFIT LEVEL."

59.     On November 4, 2019, Aetna approved the procedure(s) to be performed by Dr. Cooperman as medically necessary but denied a so-called "in-network" exception. Of course, under the clear and unambiguous terms of Ms. Shapiro's plan, no such "exception" was needed, because as an Involuntary Services, deemed as covered and medically necessary by and through

15

Aetna's preauthorization (ID # W206471279), Ms. Shapiro's cost share should have been calculated by Aetna "in the same way as [it] would if [she] received the services from a [INET] provider; which, of course obligated Aetna to either pay Dr. Cooperman's full billed charges, less only INET cost sharing amounts, or to negotiate some other fee with his office directly.

60.     Dr. Cooperman's office later called Aetna to confirm that additional procedure codes needed to be added to the prior authorization. Ray H. approved CPT 19350-50 and stated that CPT 15002 and 15201 did not require prior authorization.

61.     On November 18, 2019, Ms. Shapiro underwent a lumpectomy performed by her INET breast surgeon, Dr. Blackwood. Immediately following the lumpectomy, Dr. Cooperman and Jessica Meade, RNFA, performed oncoplastic reconstruction.

62.     The goal in oncoplastic reconstruction is twofold. First, the goal is to salvage the native breast and prevent a mastectomy. Indeed, prior to oncoplastic surgery, many patients with breast cancer would be recommended to undergo mastectomies. Second, performed a left oncoplastic breast reduction, right breast reduction, and a left nipple areola complex graft.

63.     Additionally, oncoplastic reconstruction has superior results for patients who undergo a lumpectomy. Prior to oncoplastic reconstruction, many patients who underwent lumpectomy would be left with a concave deformity in the lumpectomy. Subsequent radiation would leave significant contour deformities that were irreparable. Additionally, the nipple would frequently point in the direction of the contour deformity after radiation leaving a highly malformed breast. The results were extremely complex to modify and frequently required completion mastectomies and major abdominal flap reconstruction.

64.     In the lumpectomy patient, Oncoplastic reconstruction leaves the patient with a round and normal shape to the breast. Breast tissue from other areas of the breast that remain after

lumpectomy are rotated on a viable pedicle into the contour deformity. The skill in the procedure lies in the fact the plastic surgeon must design a flap with whatever tissue remains after the ablative portion. The plastic surgeon has no choice in which breast tissue to design the flap, but rather must create a flap of the remaining tissues. When the patient subsequently goes on to radiation, there are no resultant contour deformities, and the breast remains within aesthetically pleasing shape.

65.     Potential benefits of this approach could be improved patient satisfaction, quality of life, as well as decreased healthcare costs compared to full breast reconstruction. Since the results are achieved in a single session, the stress of further operations on patients and their families is removed, patient discomfort minimized, and healthcare costs reduced without compromising the outcome of the procedure.

66.     On November 26, 2019, Dr. Cooperman's office submitted bills totaling $127,772.00 to Aetna for Dr. Cooperman's services.

67.     On December 17, 2019, Dr. Cooperman's office received an EOB from Aetna reflecting no payment and indicating that only $3,366.55 was "approved" by Aetna for Dr. Cooperman's services, and no payment at all was approved for Ms. Mead's services. The entirety of the $3,366.55 was applied to Ms. Shapiro's deductible under her out of network cost sharing.

68.     On December 23, 2019, despite not having yet filed an appeal or request for reconsideration of any kind, Dr. Cooperman's office received a letter from Aetna purportedly denying such an appeal, and explaining its claim adjudication as follows:

> Denial Code: G02 - You received services from a health care provider who is not part of our network. We pay for this service based on your plan's out-of-network rate for the location where you received it. That rate is 105% of the Medicare Allowable Rate. Yor doctor or provider may bill you for any charges above the rate the plan allows.

69.     On January 8, 2020, Dr. Cooperman's office submitted a "Practioner and Provider

Complaint and Appeal Request" to Aetna on behalf of Ms. Shapiro. In that appeal, Dr. Cooperman's office represented the following to Aetna:

> We are in receipt of your recent claim determination. Be advised: you are leaving your member liable for an unreasonably large balance. This is a BREAST CANCER PATIENT whose services were approved prior to services rendered. Please note: The provider is open to negotiation as to not balance bill your member. At this time we are requesting this claim to be reprocessed to allow for additional payment as to leave your member financially harmless. If this claim remains unpaid we will be billing your member $120,772.00. We appreciate your prompt attention to this matter.

70.     On January 10, 2020, Aetna responded, this time abandoning its reliance on Medicare-based rates, and instead claiming to have made a "fair" payment:

> We received your request for additional payment of services for Beth E. Shapiro. After reviewing the file, we have determined that no amount in addition to our original payment to you is required. Your payment amount is based on the reported service(s) and our determination of a fair payment for the service(s) provided. Given that we believe that our original amount was fair for the circumstances, no additional amounts will be paid on the claim.
>
> **How we decide on the payment amount**
> To determine the payment amount when the provider does not participate with us **and the plan does not define the applicable allowable amount**, our responsibility is to pay a fair amount for your services.
>
> Your claim has been paid the maximum state mandated rate. We will consider this as payment in full under the terms of the members plan and additional reimbursement will not be considered.

71.     Aetna's response clearly indicates that when services rendered are "Involuntary Services", Ms. Shapiro's the plan does not define the applicable ONET rate.

72.     On February 26, 2020, Dr. Cooperman's office submitted a second "Practiner and Provider Complaint and Appeal Request" to Aetna on behalf of Ms. Shapiro. In that appeal, Dr. Cooperman's office represented the following to Aetna:

> Please accept this letter as a formal appeal. According to your

> correspondence you believe you have paid the provider a fair amount for services rendered to your member. We do not consider this payment in full and the provider reserves the right to balance bill your member if additional reimbursement is not released to the provider.

73.    On April 28, 2020, Aetna denied Dr. Cooperman's second appeal.

74.    Dr. Cooperman, through counsel, submitted additional appeals to Aetna on behalf of Ms. Shapiro on June 5, 2020 and August 17, 2020. While the arguments set forth in these appeals, by counsel, were certainly more comprehensive than those prepared by Dr. Cooperman's office previously, the responses from Aetna were not.

75.    For example, Aetna's response to the June 5, 2020 appeal was to refuse to consider it, based on a purported lack of authorization from Ms. Shapiro to have Dr. Cooperman (and his counsel) pursue the appeal on her behalf; despite of course, the duly-executed authorization Ms. Shapiro executed in favor of Dr. Cooperman being included in the June 5 appeal.

76.    Then, in response to the August 17 appeal, Aetna purported to uphold "the low reimbursement for the out-of-network left breast reconstruction, right breast reduction, full thickness graft and surgical preparation." In doing so, Aetna retreated from its "fair pay" rationale articulated in prior correspondence, and again invoked the definition of "Recognized Charge" under Ms. Shapiro's plan, and specifically the payment rate of 105% of Medicare applicable to ONET services under that plan as the Recognized Charge.

77.    Notably, however, Aetna's appeal response failed to recognize that the same pages it quoted in the appeal letter regarding the Recognized Charge contain the following clear and unambiguous disclaimer: "Recognized charge does not apply to involuntary services." And, of course, Aetna's appeal letter failed to mention Aetna's obligation to price benefits for Involuntary Services in such a way that insulated Ms. Shapiro to cost-sharing beyond her INET obligation.

78.    On March 17, 2021, Dr. Cooperman, again through counsel, attempted to appeal

directly to Ms. Shapiro's employer, the plan sponsor. The employer never responded.

79.     And finally, on July 14, 2021, Ms. Shapiro submitted her own completed "Member Complaint and Appeal Form" directly to Aetna, stating:

> THIS 2ND LEVEL APPEAL IS BEING MADE TO RESPECTFULLY REQUEST THAT THE SURGEON(S) BE TREATED AS "IN-NETWORK" UNDER MY BENEFITS DUE TO THE FACT THAT AETNA WAS UNABLE TO PROVIDE ANY IN-NETWORK PHYSICIANS AT THE IN-NETWORK FACILITY WHERE THE SURGERY WAS PERFORMED. AETNA WAS RESPONSIBLE FOR PROVIDING AN IN-NETWORK PHYSICIAN, WHICH THEY FAILED TO DO. IT IS NOT FAIR MY DOCTOR IS BEING PUNISHED FOR AETNA'S FAILURE.

80.     On October 27, 2021, Aetna responded to Ms. Shapiro with a letter identical to its response to Dr. Cooperman's August 17, 2020, appeal, invoking the definition of "Recognized Charge" under Ms. Shapiro's plan, and specifically the payment rate of 105% of Medicare applicable to ONET services under that plan as the Recognized Charge. Once again, however, Aetna's response failed to recognize that the same pages it quoted in the appeal letter regarding the Recognized Charge contain the following clear and unambiguous disclaimer: "Recognized charge does not apply to involuntary services." And, of course, Aetna's appeal letter failed to mention Aetna's obligation to price benefits for Involuntary Services in such a way that insulated Ms. Shapiro to cost-sharing beyond her INET obligation.

81.     Thus, any administrative remedies that may be required to be pursued under ERISA have, therefore, been exhausted, should be deemed exhausted under applicable regulations, or would be futile under the circumstances, and are therefore excused as it relates to Ms. Shapiro's pursuit of benefits under her plan for Dr. Cooperman's services.

82.     Aetna failed to process Ms. Shapiro's claims for benefits in a manner consistent with her plan. Dr. Cooperman, an ONET surgeon, performed the procedures in question at St.

Barnabas Medical Center, an INET facility. As such: (i) the services in question are Involuntary Services as defined under Ms. Shapiro's plan; (ii) the Recognized Charge as defined by the plan as 105% of Medicare and otherwise applicable to ONET services provided thereunder does not, therefore, apply to Dr. Cooperman's services here; and (iii) Aetna was obligated to ensure that Ms. Shapiro's out-of-pocket exposure was limited to her INET cost-sharing obligations, which can only be accomplished by either paying Dr. Cooperman's full billed charges or negotiating an ad-hoc rate with him and his practice to hold Ms. Shapiro harmless.

83.     Aetna failed to pay benefits to Ms. Shapiro that she was entitled to under the clear and unambiguous terms of her plan at her in-network cost sharing, which has left her personally responsible for the ***entire*** cost of her post-lumpectomy reconstruction, more than $127,000.

84.     Instead, Aetna paid itself a larger NAP Access Fee out of the plan assets for the purported shared savings achieved by failing to administer Ms. Shapiro's plan consistent with the Plan's treatment of ONET Rates for Involuntary Services.

**B.     Ms. Lombardi's Claims and Appeals to Aetna for Services Provided by Dr. Small.**

85.     Ms. Lombardi is a breast cancer survivor who previously underwent a double mastectomy and prepectoral tissue expander reconstruction in October 2018. Dr. Small, after having received authorization number 1747812010000000 from Aetna performed the original reconstruction. The procedure was performed at Valley Hospital, an INET facility, in conjunction with Ms. Lombardi's INET breast surgeon and oncology team.

86.     The insurance card Ms. Lombardi presented to Dr. Small's office prior to the original reconstruction procedure contained the NAP logo. And Ms. Lombardi's plan's definition of "Involuntary Services" includes services "[p]erformed at a [INET] facility by an [ONET] provider," and further provides that Aetna "will calculate [the member's] cost share for involuntary

services in the same way as [Aetna] would if [the member] received the services from an [INET] provider." Notably, the Recognized Charge under the plan for ONET professional services, which is defined as 250% of the Medicare allowable rate for the "Aetna Premier Care Network" medical plan Ms. Lombardi was enrolled with, "does not apply to involuntary services." So, Ms. Lombardi's plan, sponsored by her employer and administered by Aetna, did not contain any payment methodology for the calculation of benefits payable for ONET services performed in an INET facility, which is precisely what occurred when Dr. Small operated on her at Valley Hospital. And Aetna was obligated under the plan to ensure that Ms. Lombardi's Smith's benefits were paid in such a way to limit her out-of-pocket responsibility for Involuntary Services to her INET cost-sharing obligations.

87.    For the October 2018 post-mastectomy prepectoral tissue expander reconstruction, Aetna fulfilled its obligations. Specifically, after submitting charges more than $50,000 to Aetna for the October 2018 reconstruction, Dr. Small's office received a GlobalClaim negotiation offer of $40,650 to settle the claim, subject to Ms. Lombardi's INET cost-sharing obligations. Dr. Small's office rejected this offer.

88.    Thereafter, on December 6, 2018, Dr. Small's office had a telephone discussion with Chelaya from GlobalClaim who, on behalf of Aetna, increased the negotiation offer to $46,850, again, subject to Ms. Lombardi's INET cost-sharing obligations.

89.    Dr. Small accepted this offer. And on December 21, 2018, Aetna processed Ms. Lombardi's claim for benefits on the October 2018 reconstruction and "allowed" a payment rate of $46,850, with $41,492.50 paid to Dr. Small's office directly, and Ms. Lombardi responsible for $5,237.50, her INET deductible and coinsurance obligations.

90.    Postoperatively, Ms. Lombardi underwent additional cancer treatments, including

the removal of additional lymph nodes and left breast external beam radiotherapy.

91.     As a result, on November 12, 2019, Ms. Lombardi underwent bilateral revision of reconstructed breasts, performed by Dr. Small and assisted by Laurel Mengarelli, CRNFA. Aetna preauthorized the service under authorization number 130164801.

92.     On December 6, 2019, Dr. Small's office submitted bills totaling $82,350.00 to Aetna for Dr. Small's bilateral revision on November 12, 2019.

93.     On March 18, 2020, Dr. Small's office received an electronic EOB from Aetna reflecting no payment and indicating that the entirety of the $82,350.00 in charges was applied to "Patient Resp." The only explanation provided on the EOB as to each service line was as follows: "The claim/encounter has completed the adjudication cycle and no more action will be taken. Payment reflects usual and customary charges."

94.     On August 17, 2020, Dr. Small, through counsel, submitted a "First Level Member Appeal" on behalf of Ms. Lombardi. Among other things, the First Level Member Appeal asserted that "Payment of the billed charges was not made in accordance with the Plan" and that based on the NAP logo appearing on Ms. Lombardi's insurance card, Dr. Small's office expected to be "contacted to negotiate a reasonable and fair rate" as he was relative to the October 2018 post-mastectomy prepectoral tissue expander reconstruction.

95.     Aetna never responded to the First Level Member Appeal Dr. Small submitted on behalf of Ms. Lombardi for the November 12, 2019 surgery.

96.     On May 13, 2021, Dr. Small, through counsel, submitted a "Second Level Member Appeal" on behalf of Ms. Lombardi.

97.     On June 9, 2021, Aetna denied Ms, Lombardi's Second Level Member Appeal. In so doing, Aetna explained:

> Based upon our review, the surgical procedures were allowed correctly under the member's out-of-network benefit level. The authorization on file under reference number 1301-6480-1000, approved these procedures for the participating facility at the in-network benefit level. The authorization did not approve the nonparticipating surgeon, Tzvi Small, MD, at the in-network benefit level. Tzvi Small, MD is nonparticipating under the member's plan. We correctly allowed this claim at the out-of-network benefit level.
>
> This member's plan allows payment for nonparticipating providers at 110 percent of the Medicare rate. We allowed this claim at that rate and no further reimbursement is due.

98.     Incredibly, Aetna's June 9, 2021 letter cited to provisions in Ms. Lombardi's plan, including: (i) the definition of Involuntary Services, which includes services "[p]erformed at a network facility by an out-of-network provider"; (ii) the statement that the "Recognized charge [defined under the plan as 250% of the Medicare allowable rate, not 110% as stated earlier in the letter] does not apply to involuntary services" and (iii) the coverage obligation that Aetna will "calculate your cost share for involuntary services in the same way as we would if you received the services from a network provider." Aetna cited all these provisions, confirmed that Dr. Small was an ONET surgeon who performed the procedures in question in an INET facility, yet upheld Ms. Lombardi being left with an $80,000 bill.

99.     On July 30, 2021, Dr. Small, through counsel, submitted a "Pre-Litigation Demand" to Ms. Lombardi's employer, Bed Bath and Beyond, directly.

100.    On October 4, 2021, Bed Bath & Beyond responded, claiming to have sent the "incorrect SPD" to Ms. Lombardi previously, and purporting again that the services in question were paid at the Recognized charge, as defined in the "correct SPD" included with the letter. The correct SPD, however, contained all of the same terms regarding Involuntary Services as the "incorrect SPD," the same terms Aetna cited (but ignored) in its June 9, 2021 letter to Dr. Small in response to Ms. Lombardi's Second Level Member Appeal. Indeed, the correct SPD included:

(i) the definition of Involuntary Services, which includes services "[p]erformed at a network facility by an out-of-network provider"; (ii) the statement that the "Recognized charge [denied under the plan as 250% of the Medicare allowable rate, not 110% as stated earlier in the letter] does not apply to involuntary services" and (iii) the coverage obligation that Aetna will "calculate your cost share for involuntary services in the same way as we would if you received the services from a network provider."

101.    Thus, any administrative remedies that may be required to be pursued under ERISA have, therefore, been exhausted, should be deemed exhausted under applicable regulations, or would be futile under the circumstances, and are therefore excused as it relates to Ms. Lombardi's pursuit of benefits under her plan for Dr. Small's services on November 12, 2019.

102.    Aetna failed to process Ms. Lombardi's claims for benefits in a manner consistent with her plan. Dr. Small, an ONET surgeon, performed the procedures in question at Valley Hospital, an INET facility. As such: (i) the services in question are Involuntary Services as defined under Ms. Lombardi's plan; (ii) the Recognized Charge as defined by the plan and otherwise applicable to ONET services provided thereunder does not, therefore, apply to Dr. Smalls's services here; and (iii) Aetna was obligated to ensure that Ms. Lombardi's out-of-pocket exposure was limited to her INET cost-sharing obligations, which can only be accomplished by either paying Dr. Small's full billed charges or negotiating an ad-hoc rate with him and his practice to hold Ms. Lombardi harmless; as Aetna did with respect to the October 2018 post-mastectomy prepectoral tissue expander reconstruction.

103.    Aetna failed to pay benefits to Ms. Lombardi that she was entitled to under the clear and unambiguous terms of her plan, which has left her personally responsible for in excess of $80,000 in unpaid medical bills.

104.    Instead, Aetna paid itself a larger NAP Access Fee out of the plan assets for the purported shared savings achieved by failing to administer Ms. Lombardi's plan consistent with the Plan's treatment of ONET Rates for Involuntary Services.

**C.    Ms. Gitlin's Claims and Appeals to Aetna for Services Provided by Dr. Tamburrino.**

105.    Ms. Gitlin is a breast cancer survivor who previously underwent a mastectomy with immediate deep inferior epigastric perforator (DIEP) flap reconstruction; with virtually all the original reconstruction procedures performed by Dr. Tamburrino being paid at Fair Health. Unfortunately, she developed complications. Specifically, she had ongoing asymmetry in the size and shape of the reconstructed breast, in particular the right breast where she developed skin flap necrosis. She also developed a keloid scar of her abdominal donor site.

106.    On January 29, 2020, she underwent a revision of bilateral reconstructed breasts, fat grafting to bilateral reconstructed breast, recipient site preparation of the abdomen, and closure of abdominal defect with adjacent tissue transfer performed by Dr. Tamburrino at Doylestown Surgery Center, an INET facility.

107.    The insurance card Ms. Gitlin presented to Dr. Tamburrino's office contained the NAP logo. And Ms. Gitlin's Plan's definition of "Involuntary Services" includes services "[p]erformed at a [INET] facility by an [ONET] provider," and further provides that Aetna "will calculate [the member's] cost share for involuntary services in the same way as [Aetna] would if [the member] received the services from an [INET] provider." So, Ms. Gitlin's Plan, sponsored by her employer and administered by Aetna, did not contain any payment methodology for the calculation of benefits payable for ONET services performed in an INET facility, which is precisely what occurred when Dr. Tamburrino operated on Ms. Gitlin at Doylestown Surgery Center on January 29, 2020. Notably, pre-authorization was not required.

108.    On February 12, 2020, Dr. Tamburrino's office submitted bills totaling $61,908.86 to Aetna for the January 29, 2020 surgery.

109.    On February 25, 2020, Dr. Tamburrino's office received an EOB from Aetna for the January 29, 2020 surgery reflecting that only $2,341.41 was deemed "payable" by Aetna for Dr. Tamburrino's services. On the other hand, $59,106.24 was deemed "not payable," and the explanation on the EOB read as follows:

> The members plan provides benefits for covered expenses at the reasonable charge for the service in the geographic area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area, the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.

110.    On April 3, 2020, Dr. Tamburrino, through counsel, submitted a "First Level Member Appeal" on behalf of Ms, Gitlin for the January 29, 2020 surgery. Among other things, the First Level Member Appeal asserted that "[a] dditional payment is required for this claim so that benefits are paid in accordance with the Plan."

111.    On April 20, 2020, Aetna denied Ms. Gitlin's First Level Member Appeal for the January 29, 2020 surgery. In doing so, Aetna communicated that:

> To determine the payment amount when the provider does not participate with us **and the plan does not define the applicable allowable amount,** our responsibility is to pay a fair amount for your services.
>
> We set this payment at 125 percent of the Medicare allowable amount. The Medicare rate-setting process takes into account the factors relevant to determining a fair rate level, such as the work required for each service and a physician's office expense. State exceptions may apply.

112.    On June 17, 2020, Dr. Tamburrino, through counsel, submitted a "Second Level

Member Appeal" on behalf of Ms, Gitlin for the January 29, 2020 surgery. The Second Level

Member Appeal again demanded additional payment consistent with Ms. Gitlin's Plan, and

specifically took issue with Aetna determining a Medicare-based rate as being "fair payment,"

especially because Aetna used Fair Health to determine "reasonable, "usual and customary,"

and/or "prevailing" charges."

113.    Nevertheless, on June 24, 2020, Aetna denied Ms. Gitlin's Second Level Member

Appeal for the January 29, 2020 surgery. This time Aetna explained:

> In your appeal on behalf of the provider, on behalf of the member,
> you asked Aetna to make additional payment for the surgeon's
> charges, for breast surgery performed at a participating facility. The
> basis of the request was medical necessity, and because you felt the
> original payment was insufficient. You also mentioned there was a
> network insufficiency.
>
> Due to authorization on file, we allowed Dr. Tamburrino, a
> nonparticipating provider, the preferred ("in-network") level of
> benefits. We also allowed the recognized (reasonable and
> customary, R&C) pricing associated with nonparticipating
> professional providers being allowed the preferred benefit level of
> benefits.
>
> Aetna does not make balance bill payment based on requests
> received from providers, including provider-on-behalf-of-member
> appeals.

114.    So, after the initial EOB that reimbursement was made at a reasonable charge, and

in response to the first appeal that a "fair payment" was made on Ms. Gitlin's claim for benefits

based on a Medicare-based rate, Aetna now claimed to have paid Dr. Tamburrino a "preferred"

rate, based on UCR pricing. All for the same ONET rate, of course, which was less than 4% of Dr.

Tamburrino's billed charges for the January 29, 2020, procedure.

115.    Aetna's June 24, 2020 letter to Dr. Tamburrino's counsel went on to purportedly

cite various provisions in Ms. Gitlin's plan, including references to the manner in which Aetna

calculates the Recognized Charge for ONET services under the plan. Noticeable absent from the

letter, however, was the definition of Involuntary Services under Ms. Gitlin's plan, as well as the clear and unambiguous statement in the plan that "The out-of-network plan [, i.e., the Recognized Charge] rate does not apply to involuntary services."

116.    So, on July 28, 2020, Dr. Tamburrino, through counsel, submitted a "Pre-Litigation Demand" for the January 29, 2020 surgery directly to Ms. Gitlin's employer, Educational Testing Services, the "Plan Administrator" as set forth in the Summary Plan Description ("SPD").

117.    On October 22, 2020, Educational Testing Services responded, stating:

> Aetna is the claims administrator under the Plan with full authority to decide all claims and appeals under the Plan. Your letter contains assertions to the effect that Aetna is improperly administering the claim made by your client. Please be aware that while Aetna has full authority to decide all claims and appeals under the Plan, ETS, in fulfillment of its fiduciary duties under the Plan, monitors Aetna's administration of claims and appeals and has made specific inquiries to Aetna regarding the claim made by your client. In furtherance of our inquiry, Aetna has advised us that your client has not exhausted the Plan's internal administrative claims and appeals procedures and we continue to monitor Aetna's administration.

118.    After having Ms. Gitlin's two appeals considered and denied by Aetna, for incongruent reasons, Educational Testing Services response to her Pre-Litigation Demand was to simply note that it was "monitoring the situation" and that Aetna inexplicably claimed that Ms. Gitlin has not yet exhausted the plan's internal administrative appeals. To be clear, the plan on affords members two levels of appeals: "You can appeal two times under this plan. If you appeal a second time you must present your appeal within 60 calendar days from the date you receive the notice of the first appeal decision."

119.    Unfortunately, after having her claim for benefits for the January 29, 2020, procedure underpaid and having two appeals denied, Ms. Gitlin suffered further complications and had to undergo an additional surgery with Dr. Tamburrino in September 2020.

120.    On September 22, 2020, she presented to Doylestown Hospital with open wounds

of the abdominal donor site, and breast asymmetry. As a result, Dr. Tamburrino, performed the closure and repair of her wounds, as well as the bilateral revision of reconstructed breasts. Once again, Dr. Tamburrino operated in an INET facility, so his services qualify as Involuntary Procedures under Ms. Gitlin's plan.

121.   On September 29, 2020, Dr. Tamburrino's office submitted bills totaling $57,317.26 to Aetna for Dr. Tamburrino's services.

122.   On October 13, 2020, Dr. Tamburrino's office received an EOB from Aetna indicating that only $2,319.80 was deemed "payable" by Aetna for the September 22, 2020 surgery. On the other hand, $54,997.46 was deemed "not payable," and the explanation on the EOB again read as follows:

> The members plan provides benefits for covered expenses at the reasonable charge for the service in the geographic area where it is provided. In certain circumstances, especially where the service is unusual or not often provided in the geographical area, the reasonable charge may be determined by considering other factors, including the prevailing charge in other areas. You are not part of our network and therefore we cannot prevent you from billing the member for any balance. But if you do, we reserve the right to challenge your bill.

123.   On January 19, 2021, Dr. Tamburrino, through counsel, submitted a "First Level Member Appeal" on behalf of Ms, Gitlin for the September 22, 2020 surgery to both Aetna and Educational Testing Service. Among other things, the First Level Member Appeal asserted that "[a] dditional payment is required for this claim so that benefits are paid in accordance with the Plan." The letter also, as an alternative, demanded that pursuant to the NAP logo on Ms. Gitlin's insurance card, that either Aetna or Educational Testing Service send the claim "for settlement review and repricing, so that [Ms. Gitlin's] responsibility is limited to her [INET] cost sharing."

124.   On February 22, 2021, Aetna denied Ms. Gitlin's First Level Member Appeal for the September 22, 2020 surgery. In doing so, Aetna communicated that:

As a nonparticipating provider rendering preferred services at the in-network level of benefits to our members, your payment amount is based on the reported service(s) and our determination of a fair payment for the service(s) provided.

To determine the payment amount when a provider does not participate with Aetna **and the plan does not define the applicable allowable amount** our responsibility is to pay a fair amount lor your services.

Our nonparticipating fee schedule was developed using the industry standard of the Centers for Medicare and Medicaid Services (CMS) Resources Based Relative Value Scale (RBRVS) (the "Medicare allowable amount"), plus a premium, to provide a fair level of reimbursement for nonparticipating providers and still protect our members and plan sponsors from incurring unpredictable medical expenses. We chose a RBRVS payment methodology because it is based on the resource costs (physician work, practice expense and professional liability insurance) required to perform each service.

We set this payment at 125 percent of the Medicare allowable amount. The Medicare rate-setting process takes into account the factors relevant to determining a fair rate level, such as the work required for each service and a physician's office expense. State exceptions may apply. We have ensured that this is a fair payment for your service(s).

125.    Aetna's February 22, 2021, letter to Dr. Tamburrino's counsel again purportedly cited various provisions in Ms. Gitlin's plan, including references to the manner in which Aetna calculates the Recognized Charge for ONET services under the plan. Noticeable absent from the letter, however, was the definition of Involuntary Services under Ms. Gitlin's plan, as well as the clear and unambiguous statement in the plan that "The out-of-network plan[, i.e., the Recognized Charge] rate does not apply to involuntary services.

126.    Indeed, Aetna recognized that the plan had no fee schedule for out of network providers when confirming "**the plan does not define the applicable allowable amount.**

127.    On April 23, 2021, Dr. Tamburrino, through counsel, submitted a "Second Level Member Appeal" on behalf of Ms, Gitlin for the September 22, 2020 surgery to both Aetna and

Education Testing Services. The Second Level Member Appeal explicitly invoked the Involuntary Services language from the plan and demanded additional payment to "meet the in-network benefit cost share requirement."

128.    Neither Aetna nor Education Testing Services ever responded to the Second Level Member Appeal for the September 22, 2020 surgery.

129.    In or around this period, Aetna communicated to other Aetna member-enrollees that it changed the methodology used for determining the reimbursement amount for plans that 'do not define the applicable allowed amount' from Fair Health to using Data iSight and implemented use of Data iSight for the Educational Testing Services plan. Aetna's own documents mandate that when a member receives Involuntary Services, Data iSight will negotiate with the provider so that the member is not responsible for charges more than any applicable deductible and coinsurance/copayments. Data iSight routinely fails to resolve claims in this manner.

130.    On February 8, 2022, a representative of Dr. Tamburrino contacted Data iSight to negotiate the claim as per Aetna's guidelines. Data iSight advised that the time to negotiate had passed and the claim is no longer eligible for negotiation.

131.    Any administrative remedies that may be required to be pursued under ERISA have, therefore, been exhausted, should be deemed exhausted under applicable regulations, or would be futile under the circumstances, and are therefore excused as it relates to Ms. Gitlin's pursuit of benefits under her plan for Dr. Tamburrino's services on both January 29 and September 22, 2020.

132.    Aetna failed to process Ms. Gitlin's claims for benefits in a manner consistent with her plan. Dr. Tamburrino, an ONET surgeon, performed the procedures in question at Doylestown Surgery Center and Doylestown Hospital, both INET facilities. As such: (i) the services in question are Involuntary Services as defined under Ms. Gitlin's plan; (ii) the Recognized Charge as defined

by the plan and otherwise applicable to ONET services provided thereunder does not, therefore, apply to Dr. Tamburrino's services here; and (iii) Aetna was obligated to ensure that Ms. Gitlin's out-of-pocket exposure was limited to her INET cost-sharing obligations, which can only be accomplished by either paying Dr. Tamburrino's full billed charges or negotiating an ad-hoc rate with him and his practice to hold Ms. Gitlin harmless.

133.    Aetna failed to pay benefits to Ms. Gitlin that she was entitled to under the clear and unambiguous terms of her plan, which has left her personally responsible for amounts in excess of $114,000 in unpaid medical bills.

134.    Instead, Aetna paid itself a larger NAP Access Fee out of the plan assets for the purported shared savings achieved by failing to administer Ms. Gitlin's plan consistent with the Plan's treatment of ONET Rates for Involuntary Services.

## CLASS ALLEGATIONS

135.    Aetna has adopted and applies internal policies for calculating benefits for Involuntary Services provided by ONET providers without a NAP vendor contract that are contrary to the terms and conditions of the applicable NAP Plans and in violation of ERISA. Plaintiffs' claims were not subject to unique policies, but serve as a representative example of many Aetna Members and their ONET providers whose claims are improperly paid by Aetna that contain identical Involuntary Services written plan language.

136.    Plaintiffs therefore bring claims on behalf of a class defined as:

> All persons in the United States who were covered under a self-funded ERISA health benefit plan administered by Aetna that participates in the National Advantage Program ("NAP"), and who submitted a benefit claim, or had a benefit claim submitted on their behalf, for Involuntary Services, as that term is defined in Aetna's NAP plans, which was adjudicated by Aetna at any time within the applicable statute of limitations and for which the allowed amount as determined by Aetna was lower than the provider's billed charge and not the result of a bona fide negotiation of an ad-hoc-rate for

that particular claim for benefits.

137.    The members of this proposed Class are so numerous as to make joinder of all members impractical. Although the precise numbers are currently known only to Aetna, Aetna is one of the largest insurance companies in the United States and administers claims on behalf of millions of Aetna Members. It can therefore reasonably be concluded that, at a minimum, thousands of Aetna Members and their ONET providers are impacted by these practices.

138.    There are questions of law or fact common to the class, including but not limited to whether, in pricing Involuntary Services provided by ONET providers without a NAP vendor contract, Aetna is obligated to either: (i) pay an ONET provider's billed charges in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an Ad Hoc Rate with the ONET provider to ensure its member is not subject to Balance Billing.

139.    The claims of Plaintiffs are typical of the class claims. Each of the benefit claims at issue here were underpaid under the applicable Aetna NAP Plan because of Aetna's refusal to: (i) pay an ONET provider's billed charges in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an Ad Hoc Rate with the ONET provider to ensure its member is not subject to Balance Billing; this is precisely the nature of the claim asserted in this action on behalf of the putative Class.

140.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, is committed to the vigorous prosecution of this action, has retained counsel competent and experienced in class action litigation and the prosecution of ERISA claims, and has no interests antagonistic to or in conflict with those of the Class.

141.    Aetna has acted on grounds that apply generally to the class, as Aetna has a set policy applicable to all its NAP plans. As a result, enjoining Aetna from applying internal policies which are contrary to Plan terms and requiring it to make proper benefit determinations when

processing claims for Involuntary Services provided by ONET providers without a NAP vendor contract would be appropriate, and, as detailed below, is part of the relief sought.

142.     Questions of law or fact common to the Class members predominate over any questions particular to individual class members. The overriding common question is whether, in setting the allowed amounts for Involuntary Services provided by ONET providers without a NAP vendor contract under its NAP Plans, Aetna may arbitrarily make reimbursement determinations despite identical plan language and expose its NAP Plan members to significant Balance Billing exposure by refusing to either: (i) pay an ONET provider's billed charges in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an Ad Hoc Rate with the ONET provider to ensure its member is not subject to Balance Billing. Once the Court has determined the correct formula that Aetna must apply under its NAP Plan terms for setting the allowed amounts for Involuntary Services provided by ONET providers without a NAP vendor contract, the specific amount Aetna owes to class members under that formula can be determined formulaically.

143.     In its role as a claims administrator for the plans at issue, and in serving as an ERISA fiduciary, Aetna maintains records of when and how it receives, processes, and pays or refuses to pay claims for ONET treatment. Aetna also maintains records with respect to which of its plans participate in the NAP program, and what providers are contracted with its NAP vendor partners, such as Multiplan and Beech Street, and what claims for benefits it receives and processes are for Involuntary Services provided by ONET providers without a NAP vendor contract. Accordingly, the members of the Class can be readily and objectively ascertained through use of Aetna's records.

## COUNT I
## (CLAIM FOR RELIEF UNDER ERISA, 29 U.S.C. § 1132(a)(1)(B))

144.     The foregoing allegations are re-alleged and incorporated by reference as if fully

set forth herein.

145.    This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

146.    Aetna systematically violated the terms of the Class members' ERISA plans by refusing to either: (i) pay an ONET provider's billed charges in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an Ad Hoc Rate with the ONET provider to ensure its member is not subject to Balance Billing, causing the plans to pay less in benefits than the plan terms required for Involuntary Services.

147.    Aetna also violated its ERISA fiduciary duties, including its duty of loyalty, because its decision not to administer Involuntary Service claims in accordance with the Aetna Plans reflected its elevation of its own interests, including its interest in earning larger NAP Access Fees, above the interests of plan members, and the duty to act in accordance with the written terms of its ERISA plans.

## COUNT II
## (CLAIM FOR RELIEF UNDER ERISA, 29 U.S.C. § 1132(a)(3)(A))

148.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

149.    This count is brought pursuant to ERISA, 29 U.S.C. § 1132(a)(3)(A), to enjoin Aetna's acts and practices, as detailed herein. Plaintiff brings this claim only to the extent that the Court finds that the injunctive relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

150.    Aetna systematically violated ERISA and the terms of the Class members' ERISA plans by refusing to either: (i) pay an ONET provider's billed charges in full, less only the member's in-network cost-sharing obligation; or (ii) negotiate an Ad Hoc Rate with the ONET provider to ensure its member is not subject to Balance Billing.

## COUNT III
## (CLAIM FOR RELIEF UNDER ERISA, 29 U.S.C. § 1132(a)(3)(B))

151.    Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

152.    This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B), to obtain appropriate equitable relief to redress Aetna's violation of ERISA and of its NAP plans. Plaintiffs bring this claim only to the extent that the Court finds that the equitable relief sought is unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B) or 29 U.S.C. § 1132(a)(3)(A).

153.    By engaging in the misconduct described herein, Aetna was unjustly enriched by charging its self-funded clients a NAP Access Fee that is based on a percentage of the amount it underpaid claims to Plaintiffs and members of the Putative Class.

154.    It would be inequitable to allow Aetna to retain these benefits, considering Aetna's misconduct. Thus, Plaintiff and the Class are entitled to appropriate equitable relief, including but not limited to an appropriate monetary award based on disgorgement, restitution, surcharge, or other basis, pursuant to 29 U.S.C. § 1132(a)(3)(B).

**WHEREFORE**, Plaintiffs demand judgment in their favor against Aetna as follows:

A.      Certifying the Class and appointing Plaintiffs as Class Representatives;

B.      Declaring that Aetna violated its legal obligations in the manner described herein;

C.      Ordering Aetna to repay on behalf of Class Representative Plaintiffs and all class members, with pre- and post-interest, the amount of benefits denied as a result of Aetna's ERISA violations as alleged herein or, alternatively, ordering Aetna to reprocess all wrongfully denied claims in compliance with plan terms and without the improper reductions described herein;

D.      As an alternative remedy, ordering Aetna to make an equitable payment to Plaintiffs and members of the Class;

E.      Awarding Plaintiffs disbursements and expenses of this action, including reasonable attorneys' fees, in amounts to be determined by the Court;

F.      Permanently enjoining Aetna from engaging in the misconduct described herein; and

G.      Granting such other and further relief as is just and proper.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 40.1

I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other pending or anticipated litigation in any court or arbitration proceeding, nor are there any non-parties known to Plaintiffs that should be joined to this action. In addition, I recognize a continuing obligation during this litigation to file and to serve on all other parties and with the Court an amended certification if there is a change in the facts stated in this original certification.

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

I hereby certify that the above-captioned matter is not subject to compulsory arbitration in that the Plaintiffs seek, inter alia, injunctive relief.


Dated: April 5, 2022                     Respectfully submitted,

 /s/ John W. Leardi
John W. Leardi
Nicole P. Allocca
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
609-799-5150

Leslie Howard
Michael Fried
COHEN HOWARD, LLP
766 Shrewsbury Ave., Suite 200
Tinton Falls, NJ 07724
732-747-5202